

U.S. Department of Justice
United States Attorney
Southern District of New York

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*



MEMO ENDORSED

July 2, 2008

**BY HAND**
Honorable Richard M. Berman
United States District Court
Southern District of New York
500 Pearl Street, Room 650
New York, New York 10007

    Re:    **United States v. Judith Leekin,**
            **08 Cr. 446 (RMB)**

Dear Judge Berman:

    The Government respectfully writes in response to the Court's Order of May 22, 2008 (the "Order"). In the Order, the Court requested that the parties address the following topics in connection with their sentencing submissions:

1. Whether the mail and wire frauds could have been mitigated or prevented by the use of fingerprinting during the adoption process and whether there was fingerprinting;

2. Whether the mail and wire frauds could have been mitigated or prevented by the use of in depth "home studies" during the adoption process and whether home studies were performed;

3. What steps the Government has taken to alert the victims of the crime about the court proceedings and their right to make submissions to the Court;[1] and

4. If known, what additional steps (e.g., monitoring) may be taken to help ensure that mail and wire frauds involving adoptions do not recur.

    The Government's investigation was focused on uncovering and prosecuting the crimes that this particular defendant committed. Because of the limited focus of the investigation, the Government respectfully submits that it lacks the expertise to make recommendations about how the process of adoptions in New York can be improved upon in order to prevent similar crimes in the future. Other parties, however, are better situated to provide answers to the Court's

---

[1] On May 28, 2008, the Government included this information in a letter to the Court.

Honorable Richard M. Berman
July 2, 2008
Page 2

questions. In particular, the New York States Office of Children & Family Services ("OCFS") is the State office that oversees adoptions and adoption subsidies. NYS OCFS has submitted a response to the Court's questions, which is attached. The letter explains the policies that were in place at the time when Leekin adopted the children, and compares how those policies subsequently have been amended. Furthermore, NYS OCFS has indicated that, although it was a victim of the defendant's fraud, OCFS wishes that any restitution payments go directly to the eleven children whom Leekin adopted.

The Government will be submitting a sentencing letter under separate cover. Sentencing in this matter is scheduled for July 15, 2008.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: /s/ Alexander J. Willscher
Alexander J. Willscher
Assistant United States Attorney
Tel: (212) 637-2736
Fax: (212) 637-2452

Enclosure

cc:   Diamond R. Litty, Esq./Mark V. Harllee, Esq. (by fax)

---

Please circulate to Administration for Childrens Services general counsel (NYC) + victims + their counsel + Notify them of sentencing on 7/15/08 @ 2:00

SO ORDERED:
Date: 7/8/08
Richard M. Berman, U.S.D.J.



**New York State Office of Children & Family Services**

David Paterson
*Governor*

Gladys Carrión, Esq.
*Commissioner*

Capital View Office Park

52 Washington Street
Rensselaer, NY
12144-2796

July 1, 2008

Alexander J. Willscher, Esq.
Assistant United States Attorney
U.S. Department of Justice
United States Attorney
Southern District of New York
The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

RE: <u>United States v. Judith Leekin</u>
    08 CR. 446 (RMB)

Dear Mr. Willscher:

This is in response to the questions presented by the federal court in regard to the above referenced action involving Judith Leekin.

<u>Question #1</u>: **Whether the mail and wire frauds could have been mitigated or prevented by the use of fingerprinting during the adoption process and whether there was fingerprinting.**

<u>Response:</u> It is possible that the mail and wire frauds could have been mitigated or prevented by the use of fingerprinting during the adoption process. However, at the point in time that Judith Leekins applied to various agencies to be certified or approved as a foster or adoptive parent, a criminal history record check through the fingerprinting of such an applicant was not authorized under federal or State law.

Since then, the federal Adoption and Safe Families Act of 1997 (P.L. 105-89) added section 471(a)(20) of the Social Security Act to require that, as a condition of having a compliant Title IV-E Plan, the State had the option of either enacting mandatory criminal history record checks of any person applying for certification or approval as a foster or adoptive parent or opting out of the federal criminal history record check requirement. Consequently, New York revised State law to mandate criminal history records checks for such applicants and any other persons over the age of 18 residing in the homes of such applicants, effective February 11, 1999. The State subsequently expanded the criminal history record check requirements to include a check through the Federal Bureau of Investigation effective January 11, 2007. This change satisfies the national criminal history record



An Equal Opportunity Employer

check requirements for prospective foster and adoptive parents enacted by the federal Adam Walsh Child Protection and Safety Act of 2006 (P.L. 105-248).

In addition, since September of 2007, the New York State Office of Children and Family Services (OCFS) has a procedure to warn foster care agencies where an applicant for certification or approval as a foster or adoptive parent is also associated with another foster care agency. OCFS notifies the agency to which a person is applying of the identity of any other agency through which he or she is already certified or approved, and directs the new agency to contact such other agency. We also alert the new agency if any information provided to OCFS is inconsistent with the information provided for a prior criminal history record check on that person. Further, in all cases where a person is applying for certification or approval as a foster or adoptive parent, OCFS provides the agency to which the person is applying with all aliases reflected in the records of DCJS irrespective of whether the person has a criminal history.

Question #2: **Whether the mail and wire frauds could have been mitigated or prevented by the use of in depth "home studies" during the adoption process and whether home studies were performed.**

Response: According to the limited case records OCFS received from the agencies involved in certifying or approving Ms. Leekins, various foster care and adoption agencies conducted home studies including home visits during their application review processes. Although the then available case records include the documentation required at that time to certify or approve an applicant, we now know that some of that documentation was falsified. OCFS is unable to determine from the case files the depth of the home studies or whether the mail and wire frauds could have been mitigated or prevented if more in depth "home studies" had been done.

Since the period of time that the foster children were placed with the defendant, the regulatory standards for casework contacts (18 NYCRR 441.21) were amended to require at least monthly casework contacts with every foster child while the child is in foster care, including where the child is in a pre-adoptive status. At least two visits over a 90-day period must be held at the child's placement location. At the time of the case in question, such contacts were generally only held on a quarterly basis.

After a child is adopted, there is no legal authority for the foster care or adoption agency to visit the family unless the family seeks post-

adoption services or otherwise becomes involved in the child welfare system (e.g. through a child protective services investigation).

Question #3: **If known, what steps (e.g. monitoring) may be taken to help ensure that mail and wire frauds involving adoptions do not recur.**

Response: State statute and OCFS regulations provide that the adoption subsidy agreement signed by the adoptive parents must state that the adoptive parents are obligated to inform the appropriate State or local officials when they are no longer providing any support or are no longer legally responsible for the child (*emphasis added*). This State standard reflects the federal Title IV-E standard set forth in section 473(a)(4) of the Social Security Act. OCFS regulations also require the local social services official to remind the adoptive parents on an biennial basis of their affirmative obligations. In addition, the adoptive subsidy agreement signed by the adoptive parents requires that the adoptive parents notify the social services official of changes in the residential or dependency status of the child which would render the child ineligible for adoption subsidy.

In August of 2007, OCFS inquired of the federal Department of Health and Human Services (DHHS) concerning federally acceptable monitoring steps that could be taken on an annual basis by State or local officials regarding a family's continued eligibility for adoption subsidy after the adoption of the child. In response to this inquiry, DHHS advised OCFS that State and local officials could require adoptive parents to submit an affidavit or attestation that confirms that the adoptive parents are continuing to support the adopted child or that addresses the adoptive parents' continued responsibility to support the adopted child. However, the State or local official cannot require any accounting into the level of expenditures. Once a child is adopted, decisions on expenditures of the adoption subsidy payments are at the discretion of the adoptive parents and such decisions are not subject to further government approval or oversight.

OCFS was further informed that the State or local officials cannot suspend subsidy payments if the adoptive parents fail to respond to a State or local government inquiry into continued support of the adopted child. DHHS informed OCFS that it could not establish standards for what "any support" for the adopted child meant in order to justify the continuation of the payment of adoption subsidy. Nor could it mandate that the support provided by the adoptive parents be related to the daily needs of the adopted child as a condition for continuing adoption subsidy payment.

Based on DHHS' response, aside from requiring that the adoptive parents sign an affidavit or attestation that they are providing continuing support to their adoptive children, there is little more that State and local officials may do to monitor adoption subsidy payments.

Question #4: **What recommendations does the State of New York have regarding restitution to the victims in this case.**

Response: The State of New York supports the Court mandating restitution in the full amount of the benefits the defendant inappropriately received in this case. Any restitution awarded by the Court should go directly to the benefit of the adopted children in this case.

Please call me at (518) 473-8418 if you have any other question regarding this response.

Sincerely,

*[signature]*

Karen Walker Bryce, Esq.
Deputy Commissioner and General Counsel

4