

**U.S. Department of Justice**
*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July ~~10~~ 14, 2008

RECEIVED
JUL 14 2008
CHAMBERS OF
RICHARD M. BERMAN
U.S.D.J.

**BY HAND**
Honorable Richard M. Berman
United States District Court
Southern District of New York
500 Pearl Street, Room 650
New York, New York 10007

**Re: United States v. Judith Leekin,**
**08 Cr. 446 (RMB)**

Dear Judge Berman:

The Government respectfully writes to forward to the Court a letter from John Walsh, Esq., on behalf of the Adopted Children in this case.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: [signature]
Alexander J. Willscher
Assistant United States Attorney
Tel: (212) 637-2736
Fax: (212) 637-2452

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/14/08

cc: Diamond Litty, Esq./Mark V. Harllee, Esq. (by fax)
John Walsh, Esq. (by fax)
Renee Marquis, Esq. (by fax)
Joseph Cardieri, Esq. (by fax)
John F. Stupp, Esq. (by fax)

The Court will consider this submission in connection with the sentencing on 7/15/08.

SO ORDERED
Date: 7/14/08
[signature]
Richard M. Berman, U.S.D.J.

COLODNY · FASS · TALENFELD · KARLINSKY · ABATE

WWW.CFTLAW.COM

July 11, 2008

Honorable Richard M. Berman
United States District Court
Southern District of New York
500 Pearl Street, Room 650
New York, New York 10007

*Re:* *United States v. Judith Defendant*
*08 Cr. 446 (RMB)*

Dear Judge Berman:

As the authorized representatives of the victims in this case, we are appreciative of the opportunity to comment on the impact of the crimes committed, the inadequacy of the proposed sentence, and the responses of the New York State Office of Children & Family Services ("NYOCFS") to your Honor's questions as to how these crimes could ever occur. We represent 9 of the victims with regard to getting necessary services and gaining them compensation for the horrific and otherwise incompensable losses they have suffered. We have been authorized by S.W.'s guardian to speak on his behalf as well. Accordingly, this statement is made on behalf of S.B, age. 29; L.J., age 28; J.G., age 24; J.B., age 21; S.W., age 21; T.B., age 19; T.L., age 19; R.E., age 17; T.G., age 17; and J.L., age 16. Further, we are commenting concerning another child who resided in the home, S.A., who would have been 19 years of age. We speak on behalf of S.A., because he apparently died while in Defendant's custody and would not otherwise have a voice.

**Proposed Sentencing Guidelines Range**

While we are cognizant of the fact that the proposed Guidelines range is a result of a plea agreement, it is concerning that 6.5-8 years has been deemed an appropriate and reasonable sentence given the nature and extent of the crimes committed. Although Defendant has not been charged for the egregious and horrifying abuse and neglect of the children in these proceedings, the lifetime of that suffering is unquestionably the direct result of the crimes for which she is charged. This is not an instance where the crimes actually charged—as well as those not charged based upon the plea agreement—are basic economic offenses. The losses these children suffered as a result of Defendant's criminal acts are far more significant than the 1.68 million dollars paid to her in adoption subsidies, which surely will never be recovered from her.

There is not enough time to accurately recount each and every bizarre and cruel act of abuse, humiliation, neglect or horror that was visited upon each of these foster children. Significantly, all of these victims may have their own individual experiences and different histories, but they also share much of the same story—they were hidden from society and deprived of their education, dental care, medical care, friends, and the right to have a loving and safe family environment. They spent their lives, like property, warehoused in basements,



garages, bathrooms, and other uninhabitable locations. All were abused constantly. All of them lived in fear. All were practically starved and were found in varying stages of malnourishment, some close to death. They lost the time in their childhoods when they should have been learning to become independent adults and acquiring the life skills necessary to function. Some of them are still in foster care, some reside in adult group homes, and some are moments away from homelessness. Some of them are receiving "treatment," and some are not. All suffer from some form of permanent mental, physical, and emotional injuries that they will carry with them for the rest of their lives.

Worst of all, every victim has been deprived of the right to have a family, be it natural or adopted—a right that was stolen from them without their control when the State of New York terminated parental rights, severed many of their natural sibling relationships, and processed fraudulent adoptions that were *void ab initio*. Many of them essentially began their lives as wards of the state, and despite believing they had a real "mother"—as horrific as she was—must now face the terrible reality that they did not even have that, and are now too old to have any hope of regaining the families they lost. How do you treat the loss of something so profound? They have lost something that all of us take for granted as we move through our days, but without which we would crumble and be unable to function. They have lost their childhoods, the very thing that turns us into whole, complete adults. What therapy is there to rectify a lifetime lost? What restitution can be made? What punishment is enough? Defendant spent at least 23 years perpetrating this fraud, and these victims have spent almost the same time in their own personal nightmares.

Thus, we would like to provide at least some details of what life has been like for each of these victims:

- S.B. is the oldest and first known victim of these crimes, who was placed with Defendant at the age of 5 years. He is a sweet autistic young man who was essentially left to care for the others, including his severely handicapped siblings, including S.A. S.A. essentially lived in a bucket where he would eat, sleep, urinate and defecate. It is clear that those sights haunt him to this day. S.B. spent a lifetime experiencing being hit on the head with an iron, being regularly beaten for any small transgression, and tied up at night like a prisoner. As S.B. has said to us "Man, I've seen some things you would not believe. I've seen things no one should have to see."

- L.J. was a profoundly retarded and autistic young girl placed in Defendant's care at the age of 7 ½ years. L.J. is incapable of describing what happened to her, because she is generally non-responsive and non-verbal as a result of her extremely low functioning. Her siblings recount her pulling her decaying teeth from her own mouth, the result of a childhood of no dental care. She will be forever tortured by the memories of the horrors she suffered that are trapped in her mind and are unable to be expressed.

- J.G., placed in Defendant's care at 5 years of age, is also profoundly retarded and autistic. Like L.J., J.G.'s disabilities prevent him from being able to express what happened to him; however, we can certainly determine some of what he experienced



based on his condition. J.G. is missing teeth as a result of no dental care. Although being born and placed as a seeing child, J.G. is blind. His siblings remember a time when he could see, but explain that he was allowed to stare at the sun through a magnifying glass until he lost his vision. He walks in a stooped position, and is mostly non-communicative.

- S.A., a child with Down's syndrome and a possible congenital heart defect, was placed with Defendant as an infant. If S.A. were here maybe he could tell us what happened to him, because no one knows for certain. However, his siblings will live with the memory of S.A. becoming extremely ill, and one day seeing Defendant take him away with no notice or explanation and then returning without him. Some of his siblings were told that he was taken to a hospital where he died. Others say they were told he got better and that he could walk and talk. Still others tell us they think he was buried in the backyard.

- At 2 years of age, S.W. was the first of the Wells placements. S.W.'s story is easily told by his scars—scars all over his body from years of beatings and scars on his wrists from a childhood of nights spent handcuffed or zip-tied to his siblings or to furniture. Indeed, S.W. and J.B. (see below) were often restrained inside of a crib together, arms stretched up and handcuffed or tied to the rails, with a board placed on top, caged like animals.

- R.E., placed with Defendant at 1 ½ years of age, is a child with multiple medical and mental health needs which were completely untreated throughout his childhood. R.E. has severe periodontal problems from a lack of dental care and has needed surgery to correct problems with his "lazy" eye. R.E. walks in a stooped over position, and his legs are severely bowed. At almost 17 years of age, R.E. stood only 5'2" and weighed only 97 pounds when taken from the Defendant's home. The malnourishment was so great that he was diagnosed with "failure to thrive." Defendant's corporal punishment became so routine for him that once out of the home, he had great difficulty adjusting to the simple task of sleeping in a bed and being able to independently get food when hungry. He has just learned to write his name and struggles to find his words when he speaks. However, given time, he may develop greater language skills. He was subjected to many beatings and imprisonment in the Defendant's house. R.E. will be 18 years old in September and faces a life in group homes, much like most of the adults in this case, because he cannot care for himself. Accordingly, R.E. may never achieve his full potential.

- J.B., placed in Defendant's home with his natural siblings, T.B. and T.G., at the age of 5 ½ years, has stories of torture. From the time he was very young, he recalls being trapped in the crib with S.W., with a lid weighted by a paint can caging them together for hours on end. He could tell you about the days of being forced to stand in his underwear on a chair with a cover over his head and his arms outstretched. He could tell you about a gun being forced into his mouth. He can tell you how hard it is for him to find a job or keep a place to live out on his own, with no education, no

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385

COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

skills and no hope. The profound effect of a lifetime of such treatment is immeasurable.

- T.B., age 4 at the time of placement, can tell you with detail about the time a gun was held to her head, placing her in fear that she was going to die. She can show scars from being hit with an iron rod, a wooden board, and an electrical cord, and from having her hands burned on the stove. She unsuccessfully attempted to run away on more than one occasion and suffered the harsh consequences of vicious beatings upon her return.

- T.G. can show you her scars and tell you what it was like to supervise the "2 at a time showers" of her siblings. She was forced to be a caretaker of the children and would be held accountable for their behavior. She suffers with nightmares about being handcuffed to her siblings and Defendant's beatings with electrical cords. As a result, she has been psychologically diagnosed with adjustment disorder, anxiety, depression, and poor self-esteem. She is trying to learn to interact socially and is adjusting to being able to interact freely without fear of being beaten. She was malnourished and is very short in stature for her age. Having never attended school, she learned verbal communication by watching television and can only perform on a second grade level with basic reading and writing.

- T.L. and J.L., natural siblings, were placed together at the ages of 5 years and 2 ½ years, respectively. T.L. carries the most anger, but he will speak quite matter-of-factly about standing in his underwear with his head covered for hours. As no child was immune, he also suffered beatings too numerous to count with "the wooden board with the holes in it," from which his back clearly bears the scars. He also recalls regularly being tied up at night. Upon removal from the home, T.L. was 3 standard deviations below the mean for weight for his age level. His malnourishment was at a very dangerous level. T.L. will tell you he is in twelfth grade, but he cannot accomplish the simple mathematical problems of a second-grader. He was recently fitted for glasses and is trying to deal with his anxiety and post-traumatic stress disorder from the years of abuse he endured.

- J.L. is the youngest, but he remembers the feeling of not being allowed to go to the bathroom without permission; having to wait until Defendant returned to untie him before he could ask permission. He painfully recalls the many times that he had to go in his pants and sit in it until she returned. At present, J.L. should be in the tenth grade. However, he can barely read and can solve only the simplest of mathematical problems. He can express himself verbally, based on the knowledge he obtained from his only form of education: the television. He suffers with adjustment disorder, anxiety, and post-traumatic stress disorder.

In considering the appropriate sentence, this Court is to "impose a sentence sufficient, but not greater than necessary," to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a). Given the nature of the crimes charged and the statutory maximum of 40 years, it is inconceivable that only 8 years of imprisonment could

4

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385



COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

be considered sufficient to accomplish those goals. Quite frankly, the plea agreement does not fully address these requirements, and this Court is not bound to accept either the plea agreement or the agreed upon Guidelines range. Pursuant to § 6B1.2(a) of the United States Sentencing Guidelines, in the case of an agreement not to pursue potential charges, such as the case at bar, the Court is not precluded from considering the conduct underlying such a charge. Indeed, Defendant could have been charged with separate counts of mail fraud for each time she mailed a fraudulent annual adoption subsidy re-certification form. Our conservative estimates put that in excess of 50 counts of mail fraud, and this does not take into account the potential multiple counts of wire fraud for each transaction by which funds were transferred.

Understanding that some of the specific horrors visited upon each child as referenced above were not admitted in this case, the manner in which Defendant admitted to perpetrating this fraud in and of itself justifies an upward departure. Paragraphs 9 and 10 of the Information filed in this case describe how Defendant warehoused the children on the floor of her basement and/or garage, physically restrained them with zip-ties, secreted them from the world, and prevented them from going to school both in New York and Florida. These allegations are admitted by virtue of her plea agreement. Although the torture and physical and psychological injuries are not specifically alleged in the Information, such injuries are the natural and undisputable consequences of Defendant's admitted conduct and are in fact acts for which Defendant has been criminally charged in the State of Florida. Further, there can be no doubt that the acts of warehousing, neglecting, and physically restraining the children were done, in large part, to maximize the profits of her fraud. Accordingly, your Honor need not make new findings of fact to justify an upward departure.

This Court can impose a sentence outside of the Guidelines range if the court finds that there exists an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1). The Sentencing Commission ("Commission") has provided guidance for departures in its policy statements contained in § 5K2, several of which clearly apply to this case. In acknowledging these circumstances as grounds for departure, the Commission specifically stated that it may not have adequately taken these such circumstances into consideration in determining the applicable guideline range. *See* § 5K2.0(a)(2)(A). A few of the most significant and applicable identified circumstances based upon Defendant's own admissions are as follows:

- **Physical and/or Extreme Psychological Injury.** Pursuant to §§ 5K2.2 and 2.3, the court can increase a sentence above the authorized range where the commission of the offense resulted in significant physical or extreme psychological injury. Although the extent of the departure should depend on the extent of the injury, "when the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be appropriate." § 5K2.2.

- **Abduction or Unlawful Restraint.** "If a person was abducted, taken hostage, or unlawfully restrained to facilitate commission of the offense...the court may increase the sentence above the authorized guidelines range." § 5K2.4.

5

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385



COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

- **Extreme Conduct.** "If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guidelines range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." § 5K2.8.

Here, based upon the established facts in this case, the applicability of the above grounds for upward departure is apparent. To give the Court some frame of reference for what would constitute a reasonable sentence under these circumstances, we offer an analogy to the crimes of kidnapping, abduction, or unlawful restraint. Recognizing that the maximum statutory sentence is 40 years in this case, the guidelines range for this type of crime would be no less than 360 months to life imprisonment in circumstances such as those that exist here. We would also like to acknowledge that Defendant will hopefully be held accountable for the horrific abuse that took place in Florida as a result of the pending criminal case. However, the abuse began and occurred in New York long before Defendant moved to Florida. The State of New York has, at this time, neither filed any criminal charges nor indicated that any charges will be filed.

Based upon Defendant's brutal and inhumane conduct directed toward these innocent and totally defenseless children solely for monetary gain, we ask that you depart from the proposed Guidelines in this case and impose a sentence that more accurately reflects the nature and seriousness of the offense in accordance with 18 U.S.C. § 3553(a). If this set of facts does not call for an upward departure to something closer to the statutory maximum term of imprisonment, what possible more unimaginable crime would? Accordingly, we pray, on behalf of the victims, that you impose a penalty that more appropriately fits the nature of this crime.

**<u>The NYOCFS Response to the Court's Order of May 22, 2008</u>**

Recognizing that these proceedings are related only to the criminal charges against Defendant, we cannot allow the NYOFCS response to be part of the record without addressing these issues on behalf of the victims. While nothing can detract from the severity of Defendant's criminal acts, these children are also victims of a system that repeatedly failed at every turn to uncover the most basic and fundamental factual truths. Armed with the knowledge of New York's egregious child welfare system failures, particularly as to special needs children, Defendant recognized the ease with which she could live a lavish lifestyle funded by significant subsidies while she simultaneously warehoused and abused vulnerable children in her basement.

The NYOCFS response to your Honor's questions is superficial at best. However, the most concerning is its response to your first question relating to the use of fingerprinting, in which the NYOCFS does not admit the obvious—the use of fingerprinting unequivocally would have prevented this tragedy before it ever began. In the early 1970s, Defendant was arrested in New York for the fraudulent use of checks and attempting to fraudulently obtain a loan using her sister's identity. Therefore, her fingerprints were likely in the state system long before she applied and received her first license to foster children. Even if fingerprinting did not reveal her true identity when she was licensed as Anne Marie Williams to foster children with St. Christopher-Ottilie ("SCO") in 1984, there is no question that her subsequent attempt to pass as Cheryl Graham with the City of New York Division of Adoption and Foster Care Services ("DAFCS") just two short years later would have raised a red flag that someone with the same

6

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385



COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

fingerprints had applied for licensure using a different name. Further, assuming that Defendant's obvious fraud was still not uncovered by virtue of fingerprinting, it is unimaginable that the fraud would have continued when Defendant twice again used false identities to obtain children for money with St. Joseph Services for Children ("SJSC") and Heartshare Human Services ("HHS").

The NYOCFS defends its failure to use fingerprinting by claiming that criminal background checks and fingerprinting were "not authorized under federal or State law," as if to imply that the State of New York did not have permission or was otherwise prohibited. This is a blatant mischaracterization of the state of the child welfare laws and prevailing standards of care at the time. During this time period, many states were implementing fingerprints and background checks as the emerging standard of practice. New York did not need the federal government's permission! Indeed, not until 1999, two years after the federal government made criminal background checks mandatory, that New York finally brought itself in line with the rest of the country.

Even assuming, *arguendo,* that the NYOCFS could justify not using the most prudent practice at the time, no reasonable due diligence process was used in place of fingerprinting to determine the identity of the adoptive applicant in the case of each and every child. Every private and municipal agency involved with these children—SCO, DAFCS, SJSC, HHS, and New York's Child Welfare Administration—failed to conduct any meaningful collateral contacts with employers, neighbors, community representatives and the like to verify the information Defendant provided and make a positive determination of her identity, character, and fitness to be a foster parent.

This leads to the NYOCFS response to your Honor's second question relating to "in-depth" home studies. Once again, the NYOCFS does not accept any responsibility for what these victims have suffered, but rather states that the "available case records include the documentation required at that time," only confirming what the rest of the child welfare professionals already know—the process to foster and/or adopt children in New York during this time was easier than buying a used car. If you handed over the required paperwork, appeared to be a nice person, showed enthusiasm, and had a decent home, then you were qualified. The gravity of the system-wide and agency failures cannot be better displayed than through this case. Essentially, Defendant provided false and easily verifiable information as to every major topic that a child welfare agency, under any set of standards, ought to have independently verified as part of the application, licensing, and home study process:

- **Identity** - Defendant utilized manufactured identities and stolen social security numbers, which in at least one case, actually belonged to a male. A basic social security number verification would have uncovered the fraud, a process that would not have produced an individual's confidential or otherwise protected information. Of course, the agencies involved, had they been prudent in any sense, could have simply requested an applicant to consent to a background or credit check, just like prospective employers or financial institutions.

- **Home ownership/address** - Defendant fostered as many as 12 children at one time simultaneously through 4 different agencies residing in the same address. She used the

7

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385

COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

same address for multiple aliases, multiple placements, and the receipt of multiple payments. The agencies failed to conduct even the simplest computer "edits" designed to catch such frauds, which is the minimal standard for expenditure of government funds.

- **Employment** - under every alias, Defendant claimed to be employed by NY Life Insurance as a secretary, which formed the basis for her alleged income. Not a single phone call or letter could have been made or sent to NY Life Insurance to verify information as basic as her employment status, history, and income.

- **Household composition** - Defendant presented different people as her live-in daughter with every agency. Defendant's "daughter was presented as being committed to caring for the children both during foster care and post-adoption should Defendant's health fail. Defendant's "daughter" also utilized false identities. Despite being the back-up caregiver, none of the agencies positively determined her identity or independently verified her employment, income, character or fitness to care for these children. Defendant also has a biological son who lived with her during this time. However, it does not appear that a single agency knew of his existence, notwithstanding that at least one neighbor recalls playing with her son as a child, and noticed how differently he was treated compared to the foster children in the home.

- **Family background, support, and religion** - Defendant gave the same general story using slightly altered names and locations for her entire family history, social network, and often changed her stated religion to suit the particular agency or children involved, always claiming to be actively involved in the appropriate church. The simplest collateral contacts with reliable sources backed with independent references from neighbors, employers, and community representatives would have uncovered her fraud.

- **Education** - Defendant also provided false information as to her level of education and/or where she attended school, including claims that she spent 2 years at a community college for an LPN degree. No effort could have been made to independently verify this information either, some of which was critical to her alleged "qualifications" for providing care to multiple special needs children.

Additionally, given the number of children Defendant simultaneously fostered through these agencies, perhaps just one unannounced visit would have revealed the fraud and abuse before any adoptions took place. Unannounced visits are a basic and fundamental practice standard designed to inform caseworkers as to the true nature of the care being provided and the conditions of the home, yet Defendant apparently was given advanced notice and a "convenient" date and time for home visits. Each agency placed multiple special needs and severely handicapped children in Defendant's care, without conducting the most basic suitability assessment as to her skills or qualifications to handle and appropriately care for such children or as to the appropriateness of placing such children in the same home. Based on all of these obvious failures, it is also concerning that the NYOCFS suggested that the agencies involved conducted home studies meeting even the most minimal standards of care, let alone home studies that could be considered "in-depth."

8

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385



COLODNY · FASS · TALENFELD · KARLINSKY · ABATE WWW.CFTLAW.COM

**Conclusion**

On behalf of the victims, we thank you for the opportunity to speak on their behalf. The victims in this case have suffered a lifetime of injustice at the hands of Defendant. It is our sincerest hope that this Court will take their stories and their position in this case into consideration when issuing the sentence to ensure that it appropriately and adequately reflects the true nature of the conduct involved and the crimes committed.

Respectfully Submitted,

**JOHN WALSH, ESQ.**
Florida Bar No.: 0796360
Legal Aid Society of West Palm Beach
Foster Children's Project
315 S. Dixie Highway, Suite 102
West Palm Beach, FL 33401
Tel: (561) 833-5787
Fax: (561) 833-5826

**BABBITT, JOHNSON,**
**OSBORNE & LECLAINCHE, P.A.**
Stephan LeClainche, Esq.
Florida Bar No. 441635
1450 Centre Park Boulevard, Suite 100
West Palm Beach, FL 33401
Tel: (561) 684-2500
Fax: (561) 684-6308

**COLODNY, FASS, TALENFELD,**
**KARLINSKY & ABATE, P.A.**
Joel S. Fass, Esq.
Howard M. Talenfeld, Esq.
Florida Bar No. 312398
One Financial Plaza, 23rd Floor
100 Southeast Third Avenue
Fort Lauderdale, FL 33394
htalenfeld@cftlaw.com
Tel: (954) 492-4010
Fax: (954) 492-1144

By: ______________________
Joel S. Fass, Esquire

9

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144 | TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701 TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385

COLODNY · FASS · TALENFELD · KARLINSKY · ABATE

WWW.CFTLAW.COM

cc: Alexander J. Willscher, Esq.
Assistant United States Attorney

Diamond Litty, Esq./Mark v. Harllee, Esq.
Counsel for Defendant

Karen Walker Bryce, Esq.
Deputy Commissioner and General Counsel
New York State Office of Children & Family Services

10

FORT LAUDERDALE ONE FINANCIAL PLAZA · 23RD FLOOR · 100 SOUTHEAST 3RD AVENUE
FORT LAUDERDALE · FL 33394 · T 954 492 4010 · F 954 492 1144

TALLAHASSEE 215 SOUTH MONROE STREET · SUITE 701
TALLAHASSEE · FL 32301 · T 850 577 0398 · F 850 577 0385